**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| **REBEKAH HUSKEY**<br>1483 East Lockwood Road<br>Port Clinton, Ohio 43452<br><br>*Plaintiff,*<br><br>v.<br><br>**CITY OF PORT CLINTON, OHIO**<br>c/o Dina Shenker<br>Director of Law<br>1868 E. Perry Street<br>Port Clinton, OH 43452<br><br>and<br><br>**KENT JOHNSON**<br>423 Adams Street<br>Port Clinton, Ohio 43452<br><br>*Defendants.* | Case No. _____<br><br>Judge _____ |

**COMPLAINT WITH JURY DEMAND**

**NATURE OF THE ACTION**

1.  This is an action for unconstitutional sex discrimination violating the Fourteenth Amendment to the United States Constitution, in the form of sexual assaults and harassment by a final municipal decisionmaker and policymaker, Defendant Kent Johnson, the City of Port Clinton's fire chief. The chief's sexual assaults and harassment violated equal protection and substantive due process.

2.  The action also alleges state-law civil liability for multiple criminal acts under Ohio Rev. Code § 2307.60, common-law assault, battery, and other torts arising from October 2022 to May

2023 when Defendant Johnson repeatedly sexually assaulted Plaintiff Rebekah Huskey at their workplace and in her home.

## PARTIES

3.        Plaintiff Rebekah Huskey works and resides in Ottawa County, Ohio. She was a firefighter and emergency medical technician (EMT) for the City of Port Clinton fire division. Defendant Johnson later reassigned her, contrary to her desires, to duties serving his personal secretary.

4.        Defendant Kent Johnson works and resides in Ottawa County, Ohio. He is the fire chief for the City of Port Clinton, Ohio. He has been on administrative leave since June 2023 pending an investigation into his conduct that gave rise to this lawsuit.



*Port Clinton Fire Chief Kent Johnson, age 64*

## JURISDICTION AND VENUE

5.        This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1343, and 2201, for federal claims under 42 U.S.C. §§ 1983 and 1988. Section 1988 provides for attorney and expert fees. This Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367.

6. This Court has personal jurisdiction over Defendants, who reside in and conduct business in this District.

7. Venue is proper under 28 U.S.C. § 1391, because the events giving rise to the claims took place within this District.

### FACTUAL BACKGROUND

**Fire Chief Kent Johnson's indifference to sexual harassment.**

8. Plaintiff Rebekah Huskey is a 31-year-old woman who began working for the City of Port Clinton fire division in 2006, first as a volunteer at least at the age of 16. Johnson is a 64-year-old man who, besides being the longtime fire chief, is a friend of the Huskey family. Ms. Huskey has known Johnson since she was seven years old. Her father and fiancé both work for the fire division, too. Ms. Huskey thought of Johnson as a father or uncle, and his family like her aunts and cousins. Johnson often referred to her as his "sweet, beautiful, special Emma," referring to his own granddaughter.

9. From the beginning of Ms. Huskey's employment with the Port Clinton's fire division, Chief Johnson expressed his indifference towards sexual harassment in the division. Once, he told Ms. Huskey that she was "going to get sexually harassed," and that she needed to "pick and choose what [she] reported" because he didn't "want issues with [his] department." The entire division adopted this attitude towards sexual harassment.

**Chief Johnson grabs Ms. Huskey's buttocks while she's pregnant, and insists Ms. Huskey return early to work after her pregnancy, when he harassed and assaulted her more.**

10. When Ms. Huskey was visibly pregnant in about July 2021, she was pouring herself a cup of coffee in the office when Johnson came behind her and forcefully grabbed her butt-cheek.

11. He then left.

12. His unwanted groping shocked her.

13. According to the City of Port Clinton's policy, Ms. Huskey was not required to return to work until 12 weeks postpartum. In handling her maternity leave, Chief Johnson insisted she rely on him alone, demanding that she discuss nothing with Port Clinton's deputy auditor, Rachel Klimentov. Klimentov was generally serving in a human-resources, financial, and payroll function. When Ms. Huskey would reach out to Klimentov, Klimentov would alert Chief Johnson, who would then order Ms. Huskey not to talk to Klimentov and only to him.

14. During Ms. Huskey's maternity leave, other fire-division employees had the opportunity to receive higher EMT-A education. Johnson pressured her to attend but Ms. Huskey first declined because the classes were right after she gave birth. To attend those classes, employees must have a recommendation from their fire division and the division must pay for the classes.

15. When she was ready to attend and asked to do so, Chief Johnson refused to provide the letter of recommendation or pay for the classes so Ms. Huskey could increase her level of education.

16. He did not do this to men.

17. Just five weeks after Ms. Huskey gave birth, Johnson and EMS supervisor Gutman asked her to assist with one EMS call for the station.

18. She agreed to that one-off request, believing it would be a good idea to get out of the house for a few hours.

19. When she spoke to Johnson and Gutman, they agreed she would immediately return to her leave after assisting.

20. After completing the EMS call, she received multiple messages from Chief Johnson demanding she return to work full time.

21. She received so many messages, she relented and returned to work.

22. Chief Johnson's sexual harassment became frequent in September 2021 when Ms. Huskey's baby boy was born. He made multiple unwelcome comments to Ms. Huskey about her body, including:

- Asking if he could watch her pump her breasts.

- Stating "there are men into milking breasts" and that he could "make a fortune off that."

- Stating her breasts "looked amazing."

- Stating he has "stopped seeing [her] as a young girl," and that she was now a "grown, sexy woman."

23. From October 2021 onward, Johnson's sexual harassment escalated. He made several crude comments to Ms. Huskey about her and her fiancé (who also works for Port Clinton's fire division), including:

- Saying "if [Ms. Huskey] and [her] fiancé have sex while on duty at the fire station, [they] should do it in front of the cameras so [Johnson] could watch."

- Asking Ms. Huskey if she would engage in anal sex for her fiancé's birthday and that if she did so, it would be "easier with lube."

- Revealing that he often looked at Ms. Huskey's photos on Facebook while touching himself and had to "get creative" so that he could mentally block out her fiancé and baby from the photos and focus only on her.

24. If she wore personal attire at the station, he commented on her appearance, often saying she looked sexy. When she wore open-toe shoes at the fire station, Johnson commented on her toes and toenail polish. He would say he loves her toes, and he could make money off them by posting pictures on TikTok. He also said he had many uses for her toes and they "looked delicious."

25. Throughout this time, Ms. Huskey repeatedly made clear to Johnson that she was not interested in a romantic or sexual relationship with him.

26. She did her best to be polite and not anger him, because he was her boss—and being a firefighter and EMT was her dream job.

27. She tried to focus on her work and ignore Johnson's unwanted and unceasing attention, but she had to devote substantial time to managing his demands for her attention.

**Chief Johnson sexually assaults Ms. Huskey in his office by running his hand up her leg toward her vagina.**

28. In about July 2022, Chief Johnson called Ms. Huskey into his office ostensibly to show her a new ambulance he claimed to be buying for her.

29. When she walked into his office, she noticed he had moved his computer to the right edge of his desk, so it was no longer in front of his chair.

30. Johnson requested she come around to the back of the desk to look at his computer. He proceeded to discuss the details of the ambulance.

31. Then, Johnson pushed his chair back from the desk and ran his hand from Ms. Huskey's calf, up her leg, toward her vagina. She smelled alcohol in Defendant Johnson's breath.

32. She jumped away from Defendant Johnson and shouted, "What the fuck!"

33. He tried to approach her again, but she shoved him back in his chair.

34. He had a noticeable wet spot on his pants.

35. He requested she go near him, but she left his office.

36. Upset, she hid in an ambulance to calm down. She heard Johnson enter the bay, searching for her. But he never found her because she was crouched down in the front.

37. The next day, Defendant Johnson texted Ms. Huskey that he felt "like a pedophile."

38. Disgusted by what Johnson had done and said, given that she had known and thought of him as an uncle since she was seven years old, Ms. Huskey deleted that disgusting text message.

**Chief Johnson sends Ms. Huskey creepy and even admittedly "crude" messages.**

39. Johnson sent Ms. Huskey text messages expressing his infatuation, including these:

a. On August 9, 2022, he texted Ms. Huskey an emoji of a female sheep, the letter "R," and an emoji of fire, meaning "Ewe [You] are hot." He added, "Love you" and a heart emoji. When she asked if he was feeling better because he had been quarantined with COVID-19, he said, "I'll be fine…" But then he added: "Pictures would sure help." She didn't respond with the requested photos of herself.



b. On August 11, 2022, Chief Johnson texted Ms. Huskey requesting that she drop a couple of N95 masks in his mailbox. She agreed. He then added, "If you want to carry them in your pants for a while that would be ok," followed by a grinning emoji. He added, "Miss you.":



c. Ms. Huskey didn't rise to his bait. Knowing what he did was wrong, Johnson later added, "Sorry for being crude... Thank you for everything." And then, moments later he asked, referring to her baby's first birthday party, "You dressing up for the party" with a winking emoji:



d.  On August 12, 2022, Chief Johnson asked if Ms. Huskey was healthy. She affirmed she mostly was. Ms. Huskey asked him if he was doing okay, and Chief Johnson suddenly added, "Yeah, I just worry about my baby." When she didn't rise to that bait, he pressed, "What's the matter?" And then, "Gonna leave me hanging?"



e.  Over the course of months, Defendant Johnson sent Ms. Huskey texts making unsolicited comments like, "You look spectacular" and "Thank you for being you. You mean the world to me."

f.  Ms. Huskey tried so hard not to engage Chief Johnson with his nonsense every time there was a clear romantic or sexual connotation, inappropriate for any boss, much less a public servant.

**Chief Johnson grinds his groin into Ms. Huskey and gropes her near the bay lockers.**

40.  On or about August 15, 2022, Johnson texted Ms. Huskey about the bay lockers behind the ambulance, stating he cleared out a spot near the lockers for the fire-prevention equipment she was organizing.

41.  She was asleep and didn't respond to his message.

42.  During her next shift, Chief Johnson insisted he show her the space he cleared near the lockers. She feared for her safety because of his escalating sexual behavior toward her but Chief Johnson insisted he show her.

43.  After Chief Johnson showed her the space, he pushed her face first into the lockers, with her hands on the doors. He gripped her shoulders and pushed his groin into her. He began grunting and rubbing her back and buttocks.

44.  Ms. Huskey was frozen with fear. And she did not reciprocate.

45.  While he groped her, Johnson made comments like, "I am crazy about you" and "I would love to try your cream."

46.  When he stopped, he kissed the back of her head and her shoulder.

47.  He apologized and said, "I'm done picking on you."

48.  He tried to justify his behavior by saying he had a lot going on at home.

**Defendant Johnson seizes Ms. Huskey's phone and takes it to the bathroom.**

49. In about late August 2022, Chief Johnson asked to check the IAR ("I Am Responding") app on Ms. Huskey's phone. The app is used to alert the fire station and other employees about who is responding to a station call. Johnson claimed he wanted to ensure it worked properly.

50. Ms. Huskey told him the app was working fine because she received alerts.

51. Johnson still grabbed her phone and demanded she unlock it. Afraid to cause a scene, she did.

52. Chief Johnson then took her unlocked phone to the restroom. She objected saying "poop particles" would get on it. He said he wouldn't take it to the restroom but then did so anyway, saying he had to "take care of business."

53. He returned 30 minutes later, asking her to unlock the phone again. She unlocked it and asked what he was doing. He said, "taking care of business." After Johnson left the bathroom a second time and returned Ms. Huskey's phone, he left the fire station.

54. Ms. Huskey checked her phone to see what apps were open, to review what Johnson had seen. Under Settings, he had typed in "camera" and "photos."

55. He had apparently been looking through her photos and the photo stream was positioned on the screenshots she had taken of his crude messages. Johnson had never opened the IAR app.

56. Ms. Huskey told a colleague about the incident. He said it was creepy and gross but said, "Can you blame him? You're a pretty girl and he's a guy." After this incident, Defendant Johnson often accused Ms. Huskey of blackmailing him.

**Chief Johnson stole Ms. Huskey's underwear and socks for his own prurient, fetishist use.**

57. Over the course of Chief Johnson's persistent harassment and assaults, Ms. Huskey would discover her underwear and socks missing from her locker.

58. When she told Defendant Johnson about the missing garments and said she would put a lock on her locker, he warned her not to do so.

59. Obsessed with Ms. Huskey, and as part of his campaign of harassment, Johnson was taking and keeping her underwear and socks for his own prurient, fetishist use.

**Chief Johnson sexually assaults and inflicts pain on Ms. Huskey in her own home when she was almost completely immobile and recovering from back surgery.**

60. In about October 2022, Ms. Huskey had back surgery to repair the injury she sustained on duty the year before. The surgery rendered her immobile.

61. During her recovery, she spent most of her days on bedrest, except for her required 30 minutes of sitting time each day.

62. Her parents cared for her newborn son full-time during her recovery so that her fiancé could continue working.

63. Johnson knew Ms. Huskey's parents were caring for her son during this time and that Ms. Huskey often would be home alone for long periods of time.

64. In October 2022, Chief Johnson, in the guise of checking in on her post-surgery as her boss, showed up at Ms. Huskey's home unannounced, knocking on her door and all the windows.

65. Ms. Huskey was terrified. For her it was like something out of a horror movie.

66. Chief Johnson did not stop knocking until Ms. Huskey, who could barely move, opened the door.

67. After Ms. Huskey let him inside, Chief Johnson told her he would help her with her required 30-minute sitting for the day. He walked her over to her couch, shaking the entire time.

68. This terrified her because she sensed something bad was about to happen.

69. And it did.

70. Because of her immobility, she was only wearing a night gown. And she had not bathed for days.

71. Chief Johnson and Ms. Huskey discussed her surgery and that she was sad she could not care for her own toddler. She told him she was worried about herself and her family's stability.

72. She felt deeply insecure because Chief Johnson kept commenting throughout this discussion that she "looked sexy."

73. While Ms. Huskey was talking, Chief Johnson stood up, adjusted his pants, adjusted his belt and loosened it, and adjusted his belly gun strap.

74. Ms. Huskey saw the gun.

75. While Chief Johnson talked, he pushed Ms. Huskey's walker away from her, adjusting the brakes to do so, and sat back.

76. Chief Johnson said he would give her fiancé a job to provide for her family if Ms. Huskey could not do so. He reminded her how much he had done for her and that he plans on continuing to take care of her.

77. In that vulnerable moment, Ms. Huskey told Chief Johnson she would go back to work at Starbucks.

78. Chief Johnson then pushed her walker further out of her reach.

79. Johnson stood up and adjusted his penis, which was erect. There was a wet mark on his khakis.

80. He loosened his belt when he was adjusting himself, and then adjusted the gun belt that was around his belly but under his outer shirt, flashing his gun to be partially visible to ensure she knew he was armed.

81. She saw the gun. It frightened her.

82. He sat back down next to her.

83. Chief Johnson began rubbing her shoulder and back.

84. Chief Johnson rubbed her fresh incision, saying, "I've got magic hands. Trust me."

85. What he was doing hurt her a great deal.

86. Chief Johnson commented on her red nail polish, saying her toes looked "sexy and delicious."

87. He bent down and started rubbing her feet.

88. While groping her, he made comments about how much he "loved" her, and how he is "obsessed" with her. He said they were "destined to be together," and he wished they had met when he was younger.

89. Chief Johnson added, to Ms. Huskey's alarm and distress, "If your back wasn't broken, I'd break it."

90. Chief Johnson began kissing her shoulder.

91. Ms. Huskey was paralyzed with fear and wanted to get away from him.

92. But because of her injury she could neither move nor twist her body to evade Chief Johnson's touch.

93. She could not get up from the couch and walk away from him because he had pushed her walker out of reach. She couldn't even adjust herself away from him on the couch because of her injury.

94. She was his captive.

95. He then began forcibly kissing her face and tried to turn her head to make her to kiss him back.

96. Ms. Huskey refused to do.

97. When she did not kiss him back, he stopped touching her and slapped his hands on his legs.

98. He stood up so she could see his erection, flashed his gun again, then raised his voice sternly, "Did you have fun? It is important to me you had fun!"

99. Ms. Huskey was visibly shaking and crying.

100. Terrified of his shouting and reaction, she said, quietly, "Yes."

101. But it would have been obvious to him from the way she was shaking and her eyes were teared up that the answer was no.

102. Indifferent to her fears, Chief Johnson then said he would return later that night to "show [her] even more fun."

103. He pushed her walker back to her and reactivated the brakes.

104. He asked her if she wanted him to walk her to bed.

105. She said no.

106. He said he would let himself out and then left her house.

107. Chief Johnson left Ms. Huskey's house and, knowing Ms. Huskey was watching him through the window, sat on a concrete pig statue in her front yard and slapped the pig's rear end several times, yelling "Yee haw!"

108. Seeing this exacerbated Ms. Huskey's fear about Johnson's behavior and her trauma about what she had just endured.

109. Through that trauma, Ms. Huskey told her mother about what had happened.

110. Chief Johnson contacted Ms. Huskey later that night asking if he could come back over.

111. Terrified, Ms. Huskey told Johnson that her brother was at her house, which wasn't accurate.

112. Chief Johnson cursed her brother for "ruining [their] fun."

**Chief Johnson continues to make unsolicited visits to Ms. Huskey's home and sexually assaults her while she is immobile and bedridden.**

113. Chief Johnson returned to Ms. Huskey's home uninvited about 15 times after this incident. He made sure to only stop by when he knew Ms. Huskey was home alone with no other cars in her driveway. He would walk in the door without knocking, which, being immobile and bedridden, she had to leave unlocked not for him but for other family members who were coming in to care for her.

114. He would make it seem as though he was checking in on her as her boss, when his intentions and conduct were prurient.

115. During these visits, Ms. Huskey was still immobile and on bedrest.

116. Chief Johnson exploited this. He would sit on the side of her bed and rub her legs from top to bottom, including her toes, knowing she could not move to resist his sexual advances.

117. During the first three visits, Ms. Huskey pleaded with Chief Johnson to stop touching her.

118. But despite her begging, he refused.

119. She told him her family would be home any minute.

120. That made no difference to Chief Johnson.

121. During the visits that followed, because Johnson had ignored her pleas and continued to grope her, Ms. Huskey felt defeated and stopped asking. She knew that Johnson would not stop touching her no matter how persistently and forcefully she pleaded with him.

122. Ms. Huskey lived in a state of constant fear.

123. She told her mother and sister about the continuing assaults, and they grew concerned about her safety and well-being.

124. To try to prevent Johnson from continuing his spree of sexual assaults, Ms. Huskey's mother and sister, whenever possible, stayed with Ms. Huskey at her home when her fiancé wasn't there. If neither her mother nor her sister could stay with her on any given day, they would leave their cars in her driveway, making it appear that she was not home alone.

**When Ms. Huskey returns to work at the fire division in January 2023, Chief Johnson has taken away her job, and forces her to accept a new position as his "personal secretary"— which facilitates his continued spree of sexual harassment and sexual assaults.**

125. Following Ms. Huskey's return to work, Chief Johnson continued to harass her, sometimes even in front of other employees. His sexual-harassment conduct included the following:

- Stating "I bet you can handle a dog knot. Do you think you can handle a dog knot?" (This is a reference to sexual acts between dogs when a male dog locks up inside a female dog.)

- Stating Ms. Huskey had a "fat ass."

- Requesting that she put documents down her pants before giving them to him.

- Blaming her "period and hormones" for rejecting his sexual advances.

- Stating he "could last all night long" and that he could "make [her] eyes cross if [she] had sex with [him]."

- Stating she was "too scared" to have sex with him.

- Stating he would watch her work out on the cameras.

- Groping her breasts from the side while hugging her, which was constant and unnecessary. She would not hug back and would stiffen up in his arms. With every hug, he would rub her breasts from the side.

- Stating he wanted to "lick [her] nipples."

126. After Ms. Huskey's surgery in October 2022, Chief Johnson gave her full-time position to another employee who was not previously employed with the division.

127. Losing this full-time position meant that Ms. Huskey would no longer have health insurance for herself or her son. Knowing Ms. Huskey's concerns about her insurance, Johnson manipulated her into accepting a new position as his "personal secretary," a division job that had never existed.

128. When Ms. Huskey questioned Johnson about this new position, Johnson told her she could not return to work as a firefighter because her back was "still healing," even though he knew that Ms. Huskey's doctor had cleared her to return to work as a firefighter.

129. This new position cost Ms. Huskey the ability to earn the type of overtime she did in her previous position.

130. And because Ms. Huskey was now his personal secretary, she was now required to work directly with him much more, in the office. He began demanding that she come into work at unscheduled times and on inconsistent days, making it difficult for her and her fiancé to maintain consistent childcare for their baby.

131. The reassignment resulted in fewer working hours, including overtime, for Ms. Huskey, than what she used to earn as a firefighter and EMT. This caused her to receive overall less compensation than what she previous earned, which affected her and her family.

132. In Ms. Huskey's new position, Johnson's sexual harassment included:

- Stating he wanted his personal secretary to "sit on [his] lap."

- Stating if he "had it [his] way, [Ms. Huskey] would be [his] sex slave."

- Using Ms. Huskey's new position as an excuse to touch her and force her to share space with him.

- Approaching Ms. Huskey from behind as she sat at her desk, touching her shoulders, and moving his hands down to grope her breasts.

**Chief Johnson serially sexually assaults Ms. Huskey in a storage room, in the locker area, and then again in a storage room.**

133. In about February 2023, Chief Johnson directed Ms. Huskey into a storage room at the fire station ostensibly to show her his ideas for a new organization of the room.

134. They walked through the storage room and exchanged ideas.

135. When Ms. Huskey was looking inside a closet, Chief Johnson came up behind her. He told her he was proud of her, and he loved her.

136. Chief Johnson grabbed her shoulder and kissed her face. He rubbed his hands down her back toward her buttocks.

137. He then said, "I'm done picking on you."

138. In about March 2023, Chief Johnson asked Ms. Huskey to come with him to look at the new lockers at fire station.

139. Ms. Huskey first declined, saying that she had seen the new lockers because her fiancé helped build them and sent her a picture.

140. Chief Johnson still insisted that she go with him, so Ms. Huskey obeyed.

141. While the two were looking at the lockers, Johnson grabbed his penis outside of his pants, stating that his penis was "hard," and that Ms. Huskey "looked very sexy."

142. He then asked her to touch his penis and tried to move her hands toward it.

143. Ms. Huskey pulled her hands away, shouted, "What the fuck!" and left.

144. In early April 2023, when Ms. Huskey was alone in the storage room at the fire station, Johnson pushed her up against a sink.

145. While he was pushing his groin against her, he asked if she was "playing with the squirt sink" and whether she "squirts."

146. She said no.

147. He rubbed his groin against her said again, "Do you squirt? I bet you squirt."

148. He let her go and said, "I'm done picking on you."

149. But Johnson continued, "By the way, you're gorgeous, you should never be insecure, and I love this fat ass."

150. From behind her, he grabbed the area between her buttocks and her vagina.

151. She exclaimed, "What the fuck!" and immediately pulled away from his grip and left.

152. Ms. Huskey kept her distance after that.

153. Shortly after, Ms. Huskey was off work, and her fiancé called off work as well.

154. Chief Johnson showed up at her home on their day off unannounced. The couple had just put their toddler down for a nap and laid down for naps as well. When the chief showed up, the

fiancé went out to deal with him. But it became apparent that Johnson wouldn't leave until he saw Ms. Huskey.

155. She went out and Johnson claimed to "just be checking" on them to see if they were okay. He asked about the baby. They said he was asleep. Johnson left.

**Chief Johnson's stalkerish messages continue.**

156. On May 3, 2023 at 3:44 pm, Defendant Johnson sent Ms. Huskey a text message saying, Sexy you look great." She didn't respond:



157.    Within the hour that same day, at 4:40 pm, Defendant Johnson left Ms. Huskey a voicemail saying, "This is your favorite fan. You look very nice today.":



158.    On May 23, 2023, when Ms. Huskey reported cleaning and moving work she had completed and how she had felt tired afterward, Chief Johnson responded, "Stop.... You need to take care of yourself..... You aren't wonder woman…." with two wink-and-kiss emojis.

159.    He then added, "But you are mine…. wonder about you all the time." She replied to the first

text with a Wonder Woman® GIF and "I'm trying to be." She ignored the second, innuendo text.



**Chief Johnson demands Ms. Huskey ride with him, tries to hold her hand, complained about his life, and says it was a date.**

160.     On or about April 28, 2023, EMS Captain Brian Gutman and Ms. Huskey delivered a replacement ambulance for a patient transport, after the first ambulance broke down. Chief Johnson arrived on scene in his Chief's vehicle. The first ambulance needed to be repaired and was connected to the Chief's vehicle to be towed back to the fire station.

161.     Ms. Huskey said she wanted to ride with Gutman back to the station, but Chief Johnson insisted she ride with him. She again said she would like to ride with Gutman, but Chief Johnson demanded she get in his passenger seat.

162.     Frightened of his reaction, she got into his vehicle.

163.     To stay away from Johnson, she sat on the right edge of the passenger seat toward the vehicle door.

164.     Johnson forcibly grabbed her hand but she balled up her fist so he could only hold her pinky finger.

165.     Johnson talked about how stressful his home life is. He said he is having problems with his wife, who he claimed is never home anymore, and doesn't care if he even eats.

166.     Johnson said he "did not feel like living anymore."

167.     Referring to himself and Ms. Huskey, he said, "Our first date would never be like this."

168.     Chief Johnson said he fantasized about taking her out to a nice dinner and then "fucking [her] all night."

169.     Johnson said, again, he hates his life and death would be more peaceful. He continued to say that no one appreciates him.

170.     When they arrived at the fire station, Ms. Huskey quickly got out of the vehicle. With everyone gathered at the station, Chief Johnson said to everyone, "Yeah, I didn't think our first date would be like this." Ms. Huskey's fiancé was there, as were others.

**Chief Johnson assaults Ms. Huskey even more and tells her she has left him "with blue balls."**

171.    In May 2023, while preparing for an event at the fire station, Ms. Huskey and her fiancé saw Chief Johnson intentionally knock over a box of N95 masks.

172.    Johnson then left the station and upon his return blamed others for knocking over the masks. Ms. Huskey said she would pick them up.

173.    As she bent down to do so, Johnson bent down with her and placed his hand on top of hers. She whipped back her hand to get his hand off her. Johnson again told her he was "done picking on [her]."

174.    Chief Johnson said, "Fine, I'll leave you alone" and left the garage.

175.    On or about May 23, 2023, Ms. Huskey approached Johnson in his office to inform him that a young woman whom the division was considering hiring decided not to join the division. Johnson became upset and went on a tangent about how he did not feel appreciated by the division or the City.

176.    Chief Johnson then turned his attention to Ms. Huskey and said he didn't "feel the love from [her] anymore" and that he was "just left with blue balls." He said he took risks for her and took her on as project, gambling everything to give her a career. He said he wanted to do things for her, like purchase a new desk and chair, because he worries about her.

177.    Ms. Huskey told Johnson he did not need to worry about her. He became agitated and said, "Fine, I am done worrying about you." Then he pivoted, talking about how much he loved her and made a big show of ogling up-and-down at her body, focusing on her breasts and groin.

178.    Ms. Huskey tried to leave his office but Johnson stopped her, falsely claiming there was an issue with her shoe. He bent down, untied her shoelace, then retied it.

179.    When Chief Johnson stood up, he tried to kiss her. Ms. Huskey turned away from him and tried to leave once again, but Johnson grabbed her shoulders to keep her in place. He grabbed her

face, to the point of pain. He was shaking with anger because she tried to avoid him. He kissed the side of her face up to her ear. He was enraged with Ms. Huskey's resistance and began shaking in anger. He eventually let Ms. Huskey go.

180. Ms. Huskey shouted, "What the fuck!" and left his office.

181. Outside his office, she heard Chief Johnson throwing objects. This behavior scared her, so she left the fire station and fled to the smokehouse outside. She heard five gunshots. Because of Johnson's serial stalking and assaulting behavior, including having previously flashed his gun at her, she truly believed he shot the other employees in the firehouse and possibly shot himself. Johnson had previously said he was not afraid to kill people or to kill himself, including making statements like:

- "I have a bullet with his name on it."

- "This family needs to go."

- "I have a remedy for that … a (names a gun)."

- "He needs a healthy dose of a 9 mm."

- "I am not afraid to die."

182. Ms. Huskey panicked and hid in the fire division's fire-safety-demonstration smokehouse, terrified Johnson would look for her and shoot her. She hid for 15 minutes, thinking she was going to die, and that her son would grow up without her. She urinated on herself in her pants, in fear.

183. Ms. Huskey saw another employee leave the fire station. She wept in relief and realized the gunshots were from the shooting range down the road. She called her sister and described what happened. Her sister advised her to leave work and come home. Ms. Huskey walked back to the fire station to tell Johnson she was leaving early because she had started her period.

184. Chief Johnson responded, "Well, you're not bleeding from me."

**Ms. Huskey reports the sexual harassment and assaults to EMS supervisor Brian Gutman, Chief Johnson shows up at Ms. Huskey's home unannounced when she returns briefly from taking refuge elsewhere, and Chief Johnson is placed on administrative leave pending an investigation into his conduct.**

185. Chief Johnson tried to prevent Ms. Huskey from reporting his conduct by insisting that the person to whom she would report, Tracy Colston (the City's Safety-Service Director), would not take her complaints seriously because Colston, according to Johnson, "does not like the fire division and hates women."

186. Because Ms. Huskey was manipulated into thinking she could not report the sexual harassment and assaults to Colston, she reported her complaints to EMS supervisor Brian Gutman on May 30, 2023. Gutman told her that her report was sent to Port Clinton's law director few days later.

187. For her safety because of Johnson's behavior, Ms. Huskey had generally been staying further away from home, like a refugee.

188. She returned to her home on the morning of June 3, 2023 to do laundry, while her fiancé worked a 24-hour shift at the fire division.

189. Chief Johnson arrived at her home unannounced at 10 A.M., in his fire-division vehicle, and knocked aggressively on her door.

190. As chief, Johnson knew her fiancé worked a 24-hour shift, so he knew she would be alone.

191. Ms. Huskey opened the door.

192. Chief Johnson said he was calling, texting, and driving by the house to get ahold of her.

193. They discussed her recent emergency surgery and childcare for her son.

194. Chief Johnson said he was sorry for "picking on [her]," and that he was worried it would "mess [her] up."

195. He claimed he would leave her alone.

196. He said something about hiring a counselor for fire-station employees and said she should talk to her.

197. Johnson was placed on administrative leave on or about June 6, 2023.

**Chief Johnson removed or discarded Ms. Huskey's firefighter/EMT continuing-education training records.**

198. When leaving his office after he was notified about being placed on leave, Johnson discarded boxes of documents and left the office with boxes, which he loaded into his vehicle.

199. Part of what he took or destroyed was Ms. Huskey's continuing-education records, to interfere with her ability to recertify as a firefighter. She now must work harder to redo the continuing-education hours she had banked, the records of which Chief Johnson maintained.

200. Johnson also went into the women's bathroom before leaving. Previously, Johnson had commented on Ms. Huskey's habit of taking a sink bath in the women's bathroom before going to bed while on overnight firefighting duty—something he should not have known. He said she takes a "birdbath."

201. Ms. Huskey had been so creeped out by that, she then used to use the toilet at night in the stationhouse, in the dark, with a flashlight to avoid any motion-detecting camera.

202. The City placed Ms. Huskey on administrative leave as well with no apparent end in sight to the outside, supposedly independent investigation the City ordered.

203. Because of Defendants' conduct, Ms. Huskey earns far less money than she did or would have with her firefighting and EMT duties. This has been hard on her and her family.

204. Chief Johnson treated no male firefighter or EMT the way that Chief Johnson treated Ms. Huskey.

205. Ms. Huskey sought, received, and continues to receive mental-health treatment because of Johnson's perverted and unlawful acts. She has lived in terror for her baby, fiancé, and her own safety.

She has had recurring, brutal nightmares about him. For months she lived in hiding away from Chief Johnson and her own home, afraid he would enter her home.

206. She has been diagnosed with post-traumatic stress disorder and betrayal trauma.

**After Ms. Huskey injured her back as a EMT while saving a man at the scene of an accident, and Chief Johnson ordered her to withdraw her claim, which exacerbated her injury.**

207. Ms. Huskey severely injured her back in 2021 trying to lift an unusually heavy man from the scene of an accident, while she was on duty as an EMT. She tried to nurse the injury herself but needed continual treatment at the ER to manage her pain. During an ER visit in December 2021, she applied for workers' compensation.

208. When Chief Johnson received notice, he became upset with her submitting the application. He questioned whether her injury happened while she was on duty, stating she should have informed him of the injury the night it happened. He falsely tried to blame the injury on natural childbirth. For months, he mocked her repeatedly with this claim.

209. Ms. Huskey's workers' compensation application was accepted in December 2021 and, soon after, she attended an appointment with a workers' compensation doctor.

210. Chief Johnson received notice of the approval and intimidated her into withdrawing her claim. He manipulated her into believing her application was not actually approved and that she would be accused of fraud because she did not file the application the night of her injury. Those claims were false.

211. Chief Johnson said he could dismiss the application himself because the fire division already had three active workers' compensation claims. She worried that maintaining her claim would continue to upset Chief Johnson and ruin her career.

212. Chief Johnson was worried about increasing the City's fire-division-related workers' compensation premiums.

213. Ms. Huskey's workers' compensation doctor discussed maintaining the claim, but she feared Chief Johnson's reaction. Because Johnson demanded it, Ms. Huskey withdrew her workers' compensation claim on December 12, 2021. As a result, she paid many of her further medical expenses out of pocket, including for her back surgery in October 2022. These expenses would have been covered by workers' compensation.

214. Also because of Chief Johnson's misconduct, she was unable to obtain the early MRI that would have diagnosed the specifics of her back condition, which would have enabled her to seek treatment earlier and stop additional damage. Workers' compensation would have covered that MRI, but her health insurance did not. Because she did not receive that early, needed MRI, she has been diagnosed with nerve damage in her right leg and has experienced far more pain than she otherwise would have. She would have experienced permanent paralysis but for the October 2022 surgery.

215. Chief Johnson's actions deprived Ms. Huskey of her right to workers' compensation benefits.

216. Because of the way that Chief Johnson so controlled her, and blocked her access to the central city administration, who would always refuse to respond to her and tell him about her requests, Ms. Huskey believed that she had no place to go with any of her concerns about the fire chief.

## CLAIMS

### CLAIM 1
**Denial of equal protection under the Fourteenth Amendment (sex discrimination in the form of sexual assault, harassment, job reassignment, and pay reduction) against the City of Port Clinton (for injunctive relief and, under *Monell*, damages) and Defendant Kent Johnson (for injunctive relief in his official capacity and damages in his individual capacity) for his personal actions and for supervisory liability, under 42 U.S.C. § 1983**

217. Plaintiff incorporates all previous allegations.

218. Ms. Huskey has a right, protected by the Fourteenth Amendment's equal-protection clause, to be free from invidious discrimination based on sex in public employment.

219. As detailed above, Ms. Huskey suffered purposeful or intentional discrimination including, but not limited to, through sexual assault, sexual harassment, unwanted job reassignment, and reduced overall compensation from what she used to receive as a firefighter and EMT.

220. As detailed above, Defendants violated Ms. Huskey's constitutional right to be free from sex discrimination.

221. Ms. Huskey's right to be free from sex discrimination in employment was clearly established and any reasonable public employee or official would have known of that.

222. Defendant Johnson's sexual assaults and sexual harassment of Ms. Huskey was discrimination against her because of her sex, as was Johnson's unwanted job reassignment of her and failure to reinstitute her to her firefighter and EMT duties.

223. As fire chief, Defendant Johnson was Ms. Huskey's supervisor and controlled the terms and conditions of her public employment.

224. As fire chief, Defendant Johnson was a final decisionmaker and policymaker for Defendant City of Port Clinton's fire division, acting under color of law.

225. Defendants' conduct was objectively unreasonable given Ms. Huskey's clearly established constitutional rights.

226. As a direct and proximate result of Defendants' unlawful conduct, Ms. Huskey's has suffered and will continue to suffer damages for which Defendants are liable.

227. The risk that Defendant Johnson will be reinstated and placed back in a position to sexually assault, harass, and retaliate against Ms. Huskey warrants injunctive relief against Defendants. They must be enjoined from further harming Ms. Huskey.

228. Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

## CLAIM 2
**Violation of substantive due process under the Fourteenth Amendment for sexual assault against the City of Port Clinton (for injunctive relief and, under *Monell*, damages) and against Defendant Kent Johnson (for injunctive relief in his official capacity and damages in his individual capacity) for his actions and for supervisory liability, under 42 U.S.C. § 1983**

229. Plaintiff Huskey incorporates all previous allegations.

230. Ms. Huskey has a substantive right to bodily integrity and privacy, protected by the Fourteenth Amendment's due-process clause, to be free from sexual assault by a local-government official, her supervisor.

231. As detailed above, Ms. Huskey suffered purposeful or intentional discrimination based on sex by Defendant Johnson's sexual assaults. This violated her constitutional right to substantive due process.

232. Ms. Huskey's right to be free from sexual assault was clearly established and any reasonable public employee or official would have known about that.

233. As fire chief, Defendant Johnson was Ms. Huskey's supervisor and controlled the terms and conditions of her public employment.

234. As fire chief, Defendant Johnson was a final decisionmaker and policymaker for Defendant City of Port Clinton's fire division, acting under color of law.

235. Defendants' conduct was objectively unreasonable given Ms. Huskey's clearly established constitutional rights.

236. As a direct and proximate result of Defendants' unlawful conduct, Ms. Huskey's has suffered and will continue to suffer damages for which Defendants are liable.

237. The risk that Defendant Johnson will be reinstated and placed back in a position to sexually assault and retaliate against Ms. Huskey warrants injunctive relief against Defendants. They must be enjoined from further harming Ms. Huskey.

238.     Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

**CLAIM 3[1]**
**CIVIL LIABILITY FOR CRIMINAL ACTS UNDER OHIO REV. CODE § 2307.60 (A)(1) AND, INCLUDING, BUT NOT LIMITED TO, OHIO REV. CODE §§ 2903.13(A) (ASSAULT), 2905.01(A)(4) (KIDNAPPING), 2905.02 (ABDUCTION), 2905.03 (UNLAWFUL RESTRAINT), 2907.05(A)(1) (GROSS SEXUAL IMPOSITION), 2907.06 (SEXUAL IMPOSITION), 2903.211(A) (MENACING BY STALKING), 2921.45 (INTERFERENCE WITH CIVIL AND STATUTORY RIGHTS), 2921.44(E) (DERELICTION OF DUTY), 2913.42 (TAMPERING WITH RECORDS), 2913.48 (WORKERS' COMPENSATION FRAUD), AND 2923.03 (COMPLICITY), AGAINST DEFENDANT KENT JOHNSON**

239.     Plaintiff incorporates all previous allegations.

240.     Under Ohio Rev. Code § 2307.60(A)(1) (Civil Liability for Criminal Acts), "Anyone injured in person or property by a criminal act has, and may recover full damages in, a civil action," including attorney fees and punitive damages.

241.     Ohio Rev. Code § 2903.13(A) (Assault) provides that "no person shall knowingly cause or attempt to cause physical harm to another..."

242.     Ohio Rev. Code § 2905.01(A)(4) (Kidnapping) provides that "no person, by force, threat, or deception…shall…restrain the liberty of the other person…to engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will…"

243.     Ohio Rev. Code § 2905.02(A)(2) (Abduction) provides that "no person, without privilege to do so, shall knowingly…by force or threat, restrain the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear…" Ohio Rev. Code § 2905.02(B) provides that "no person, with a sexual motivation, shall violate division (A) of this section.

---

[1] When Plaintiff amends and supplements her complaint to include Title VII and Ohio Rev. Code § 4112 claims, for which she awaits her right-to-sue letters, she may break this claim into individual claims for each alleged criminal act and additional criminal acts that relate back.

244.     Ohio Rev. Code § 2905.03(A) (Unlawful Restraint) provides that no person "without privilege to do so, shall knowingly restrain another of the other person's liberty." Ohio Rev. Code § 2905.03(B) (unlawful restraint) provides that no person "without privilege to do so and with a sexual motivation, shall knowingly restrain another of the other person's liberty."

245.     Ohio Rev. Code § 2907.05(A)(1) (Gross Sexual Imposition) provides that "no person shall have sexual contact with another…[when] the offender purposely compels the other person…to submit by force or threat of force."

246.     Ohio Rev. Code § 2971.01(J) defines "sexual motivation" as "a purpose to gratify the sexual needs or desires of the offender."

247.     Ohio Rev. Code § 2907.06 (Sexual Imposition) provides, in relevant part:

(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:

(1) The offender knows that the sexual contact is offensive to the other person, or one of the other persons, or is reckless in that regard.

(2) The offender knows that the other person's, or one of the other person's, ability to appraise the nature of or control the offender's or touching person's conduct is substantially impaired.

248.     Ohio Rev. Code § 2903.211(A)(1) (Menacing by Stalking) provides that

No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person. In addition to any other basis for the other person's belief that the offender will cause physical harm to the other person or the other person's family or household member or mental distress to the other person or the other person's family or household member, the other person's belief or mental distress may be based on words or conduct of the offender that are directed at or identify a corporation, association, or other organization that employs the other person or to which the other person belongs.

Ohio Rev. Code § 2903.211(A)(2) bars the use of telecommunications for these criminal purposes. And Ohio Rev. Code § 2903.211(A)(3) provides that, "No person, with a sexual motivation, shall violate division (A)(1) or (2) of this section."

249.    Ohio Rev. Code § 2921.45(A) (Interference with Civil and Statutory Rights) provides that "No public servant, under color of the public servant's office, employment, or authority, shall knowingly deprive, or conspire or attempt to deprive any person of a constitutional or statutory right."

250.    Ohio Rev. Code § 2921.44(E) (Dereliction of Duty) provides that "No public servant shall recklessly fail to perform a duty expressly imposed by law with respect to the public servant's office, or recklessly do any act expressly forbidden by law with respect to the public servant's office."

251.    Ohio Rev. Code § 2913.42(A)(1) (Tampering with Records) provides that, "No person, knowing the person has no privilege to do so, and with purpose to defraud or knowing that the person is facilitating a fraud, shall do any of the following: (1) Falsify, destroy, remove, conceal, alter, deface, or mutilate any writing, computer software, data, or record…." The statute makes it a felony when the records are those of a local government.

252.    Ohio Rev. Code § 2913.48 (Worker's Compensation Fraud) provides, in relevant part:

> (A) No person, with purpose to defraud or knowing that the person is facilitating a fraud, shall do any of the following:… (3) Alter, falsify, destroy, conceal, or remove any record or document that is necessary to fully establish the validity of any claim filed with, or necessary to establish the nature and validity of all goods and services for which reimbursement or payment was received or is requested from, the bureau of workers' compensation….

253.    Ohio Rev. Code 2921.03(A)(4) (Complicity) provides in relevant part that, it is a crime to "cause an innocent or irresponsible person to commit the offense."

254.    As detailed above, Defendant Johnson's conduct constituted criminal acts under the above and other criminal laws.

255.    As a direct and proximate result of Defendant Johnson's unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendant is liable.

256. Defendant Johnson's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendant and others from engaging in this type of unlawful conduct.

### CLAIM 4
### INTENTIONAL TORT—ASSAULT, AGAINST DEFENDANT KENT JOHNSON

257. Plaintiff incorporates all previous allegations.

258. Defendant Johnson's intentional actions caused Plaintiff repeated reasonable apprehension of an immediate harmful or offensive contact.

259. As a direct and proximate result of Defendant Johnson's unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendant is liable.

260. Defendant Johnson's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendant and others from engaging in this type of unlawful conduct.

### CLAIM 5
### INTENTIONAL TORT—BATTERY, AGAINST DEFENDANT KENT JOHNSON

261. Plaintiff incorporates all previous allegations.

262. Defendant Johnson intentionally and repeatedly caused harm or offensive contact to Plaintiff without her consent.

263. As a direct and proximate result of Defendant Johnson's unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendant is liable.

264. Defendant's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendant and others from engaging in this type of unlawful conduct.

### CLAIM 6
### INTENTIONAL TORT—FALSE IMPRISONMENT, AGAINST DEFENDANT KENT JOHNSON

265. Plaintiff incorporates all previous allegations.

266. Defendant Johnson intentionally confined Plaintiff without her consent, violating her right to be free from restraint of movement.

267. As a direct and proximate result of Defendant Johnson's unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendant is liable.

268. Defendant Johnson's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendant and others from engaging in this type of unlawful conduct.

## CLAIM 7
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, AGAINST DEFENDANT KENT JOHNSON

269. Plaintiff incorporates all previous allegations.

270. In conducting himself as he did, Defendant either intended to cause emotional distress or knew or should have known that the actions taken would result in serious emotional distress to Plaintiff.

271. Defendant's conduct toward Plaintiff, including, but not limited to, assaulting, battering, and unlawfully restraining Plaintiff went beyond all possible bounds of decency and was such that it could be considered intolerable in civilized society.

272. As a direct and proximate result of Defendant Johnson's unlawful conduct, Plaintiff suffered and will continue to suffer mental anguish so serious and of a nature that no reasonable individual could be expected to endure it and for which Defendant is liable.

273. Defendant Johnson's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendant and others from engaging in this type of unlawful conduct.

### PRAYER FOR RELIEF

For the reasons stated above, Plaintiff respectfully requests the following relief from the Court:

A. Declare that Defendants' acts and conduct constitute violations of federal and Ohio law;

B. Enter judgment in Ms. Huskey's favor as to all claims for relief;

C. Award Ms. Huskey full compensatory damages, economic and non-economic, including, but not limited to, damages for pain and suffering, mental anguish, emotional distress, humiliation, and inconvenience that Ms. Huskey has suffered and is reasonably certain to suffer again.

D.  Award Ms. Huskey punitive damages for Defendants' intentional and malicious violations of federal and Ohio law;

E.  Award prejudgment and post-judgment interest at the highest lawful rate;

F.  Award Ms. Huskey her reasonable attorney fees (including expert fees) and all other costs of this suit;

G.  Enjoin Defendants from further misconduct.

H.  Award all other relief in law or equity to which Ms. Huskey is entitled and that the Court deems equitable, just, or proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues within this Complaint.

Dated: September 29, 2023          Respectfully submitted,

THE CHANDRA LAW FIRM LLC

*/s/ Subodh Chandra*
Subodh Chandra (0069233)
Donald P. Screen (0044070)
1265 West 6th Street, Suite 400
Cleveland, Ohio 44113-1326
216.578.1700 Phone
216.578.1800 Fax
Subodh.Chandra@ChandraLaw.com
Donald.Screen@ChandraLaw.com

*Attorneys for Plaintiff Rebekah Huskey*